1540 Ineos USA v. Berry Plastics. Mr. Dunner. Good morning, Your Honors, and may it please the Court. There are multiple reasons that Ineos admits to the District Court error in granting summary judgment based on anticipation, but there is one issue that is potentially case dispositive of the entire case, if you agree with Ineos, and that is the issue of whether or not the principal lubricant is disclosed within the ranges set forth in all the claims, 0.05 to 5%. We submit that the 846 patent, which is the reference relied on for the principal lubricant within that range, it does disclose stearamid, which the District Court relied on and which Berry relies on, but the ranges disclosed either overlap or encompass the claimed range. If we agree with you, Mr. Dunner, that the District Court erred when he found that 0.1, 0.2, or 0.4 were discrete embodiments rather than ranges, that's your argument, right? That they are themselves a disclosure of range, they are not precise species embodiments. That's exactly right, as supported by the OSRAM. And if we agreed with you on that, then wouldn't the question become one of criticality at that point? Yes, the question would become one of criticality, and we have relied on the OSRAM case, which basically says it was error for the District Court to ignore an expert declaration or expert evidence on criticality. Yes, but Dr. Scott was your expert, and he didn't offer any criticality testimony on the primary lubricant, which is the issue you started with and what you and I are discussing. He talked in his declaration only about criticality with regards to the secondary lubricant, which is the one that listed 0% to 0.15%. Am I missing something in Dr. Scott's declaration that goes to criticality with regards to the range of the primary lubricant, the 0.05 to 0.5% range? Your Honor, I'm not avoiding your question, but I will tell you that the Plume Declaration... Okay, but Mr. Plume is not an expert. He's not an expert. Okay, fine. So the Plume Declaration at page 1243, is that what you want to refer me to, paragraph number 19 on criticality? Yes, that's exactly right. To circle back, you agree that Dr. Scott did not himself testify on criticality with regards to the primary lubricant, correct? I couldn't find it. It's not long, I read the whole thing. I had thought that Dr. Scott did talk about criticality of the principal lubricant, but since you challenged me... You can tell me on rebuttal if you find it. Okay. But so let's talk about Dr. Plume, if you don't mind, and his discussion of criticality, Mr. Plume, on page 1243. Yes. What is it that he says makes the claimed range 0.05% to 0.5% critical, such that it creates a question of fact like in Adafina and in Osram? He says that on page 1243, too much of the principal lubricant would not only add unnecessary cost, it may cause other problems while having little effect on reducing friction, and he says that too much of the principal lubricant, because the prior art disclosed a range that went higher, too much of it will add unnecessary cost. Is that what criticality is about? Criticality, quite clearly in both Clear Value and Osram, is criticality of the operability of the invention. So is the fact that too much lubricant would add additional cost to the manufacturer of the bottle caps, is that going to the criticality of the operability of the invention? Your Honor, if that's all he said, then there might be a debate, but he goes on to talk about it may cause a white shade in the shape of clouds on the surface of caps, a phenomenon that we call the blooming of the lubricant, and he goes on to talk about that problem. What does the blooming have to do with what is central to the invention? What is central to the invention has to do with the taste and smell, and the fact that it might affect the caps or have some impact on what consumers look at doesn't really seem to be central to the invention, which is what Osram said, that criticality had to go through. Your Honor, I think we're entitled to rely on evidence, which is unrebutted, which shows a critical reason for having a limit. Well, that may be, but the problem, it seems to me, is that in order to... Let's take a simpler case of a genus and a subgenus, and the genus is in the prior, or the subgenus is now claimed, and you have to show, don't you, that there's something unexpected about the properties of the subgenus to make it patentable that distinguishes it from the broader range, correct? Well, okay. And so, I don't read this affidavit as saying that this blooming phenomenon resulting from too much lubricant was something that was unexpected or not known in the prior art. Your Honor, the fact that this invention came six years after the prior invention, which was also developed by Ineos, suggests, as the affidavits show, that the earlier invention, which relied on zeolites, was unsuccessful. They worked for six years. That may be, but I'm focusing on the specific property here that he says differentiates the range that they've chosen, but he doesn't say there's anything... He says, maybe there's a benefit to having this narrower range or not allowing you to go above 0.5, and he says that that's desirable because going above 0.5 might cause blooming, but he doesn't say that this was an unexpected or unknown property. Your Honor? Doesn't he have to say that there's something unexpected or novel about this particular aspect of it? Your Honor, the burden of proof is on Berry to show anticipation. We have shown by this affidavit, and I think by Scott, though I'm not sure, that there's a critical upper limit, and in fact, this Plume Declaration doesn't limit it to upper limit. It talks about the entire concentration range, and he identifies the problem of what happens if you go too high. But wait, the default rule in clear value is that if you're within the range, that it's anticipated, unless there's some level of criticality that relates to the purposes of the invention, and the purposes of this invention have to do with the organoleptic properties, right? That's one of the purposes, Your Honor. The evidence shows that there are multiple reasons, multiple advantages. One is organoleptic properties, odor, taste, but the evidence that is in the record shows that there's still another reason, having to do... What is in the patent that says that that's the problem that the patent was attempting to solve? The patent does not mention blooming. The patent mentions, as I recall, organoleptic properties, but I submit we're entitled to rely on evidence in the record that shows that there is an advantage resulting from a critical range. I understand it, but Azzarone says the advantage must be central to the invention. Uses that language, central to the invention. How is blooming... It also says related to the operability of the invention as claimed in the patent. Those words also appear in clear value. So I just don't think that you can come up with an ex post advantage and submit a declaration, no matter how irrelevant it is, to the operability of the invention, because all of this evidence, it simply goes to commercial advantages of doing it the way that he says. This doesn't go to operability. Blooming doesn't affect friction. Blooming doesn't affect odor. Blooming doesn't affect taste. He just says, and he even says it in his thing, he says why, he says consumers are less likely to purchase a drink if the cap appears to have white spots on top of it. It goes to... That's his testimony as to why this range is better, because it avoids blooming, because consumers... Not that it affects anything else except for consumer preferences. That can't be what criticality is about. Your Honor, I don't know of any case... If we have an advantage that says when you go beyond a certain range, it creates problems which... Not problems in operability, problems in marketability. That's what you've said. His declaration doesn't say it creates problems in operability. It says it creates problems in sellability. Your Honor, I don't know that the cases talk about operability. I don't know that the cases say the advantage has to relate to operability. In this case, in a way, if it causes odors or if it causes a bad taste, that is a consumer issue just as much as blooming or cloudy caps are an issue. I don't know that either one goes to operability in the sense that it won't work. It will work if it doesn't taste well. It will work if it has an odor, but it just is not attractive from a consumer standpoint, and that's what we're relying on. In any event, I submit that the cases we relied on, Adafina, Osram, and Quantum, make it clear that the ranges that they disclose... What you seem to be saying is that claiming a narrower range takes you out of an anticipation problem. That can't be true, right? That just can't be true. It can't be that every time there's a range and you narrow the range that somehow you avoid anticipation, right? Unless you can show it is critical, just narrowing the range. What does critical mean? Critical means that, in this case, beyond a certain point, which in this case is 0.5, you get results that negatively impact on the use of this invention. And that has to be unexpected, right? You have to make a discovery that's unexpected. There's nothing suggesting it was expected. No, no, but do you agree with me that it has to be unexpected? Let me answer it this way. If you would expect that cutting it off at a certain range would create a problem, if you would expect that... No, but it has to be. It has to be. The discovery that is alleged to have been made, that the subgenus is special, is different from the broader genus. You have to show that it's different in some meaningful way that is novel and unexpected. No? I will say yes, but there's no evidence suggesting that it was expected because the judge held Berry did not have to submit any responsive criticality evidence. The judge not only didn't look at, didn't rely on our criticality evidence, but basically said Berry did not have to respond. So we submit, we have an affidavit from Flume, and we have an affidavit from Scott, and I will at the break look and see whether he talked only of subsidiary lubricants, basically saying that it's critical. Scott uses words like central to the invention, and Flume talked about a problem resulting from it. There was no response to that. So I suggest that on this record, summary judgment is improper. I mean, that's the kind of thing that a jury should consider. If they wanted to respond with a responsive declaration, they could have done that and said, this is not critical, this is expected. There's nothing in the record suggesting that. And I see I only have... Now you want to, we'll give you two minutes for rebuttal. Pardon? We'll give you two minutes for rebuttal. Okay, thank you. Ms. Pollack-Milgay? Yes, good morning, Your Honors. May it please the Court. I'd like to note for the Court one point of agreement between the parties, and then jump right into the range issue and address that concern with you head on. And obviously the concerns are well-founded, and that is the parties here today agree that the claim limitation, the second limitation of Claim 1 is really the only claim limitation that's in dispute. And that is the saturated fatty acid amide component in a particular range. So to go right to the range issue head on, it is our position that either under a criticality standard or just looking at the clear disclosure of the 846 patent, that there is really no issue with respect to criticality. And this is how this goes. First of all, we have, as the Court has noted already, this disclosure in the 846 of teaching the use of .1 or .2 or .4, and calls those the most common points. So while the language there is at least as well, it's identified as the most common point. No, but the sentence, you're stopping. The sentence read as a whole talks about .1 in particular of at least .2 parts by weight, or quantities of at least .4 parts per weight being the most common one. The total quantity of lubricating agent doesn't exceed 5 parts per weight, more especially 2 parts per weight, or a maximum of 1 part per weight. It's kind of hard for me to say that's not a range. You've got a starting point and an ending point in the same exact sentence, and yet you want me to find that to be a discrete point. Your Honor, we believe it is both. How? At least .1 with a maximum of 1. How is that a discrete point? Well, if you read the entire disclosure in context, and you have at least .4, what you find in Example 1 of the 846 patent is a total lubricant percentage of .45%. If Example 1 doesn't contain any of all of the other, in fact, it contains a subsidiary lubricant of greater than .15. So it doesn't contain the other elements of the claim, and our precedent is quite clear. You can't pick and choose your elements from different embodiments in a prior art reference, combine them together, and then call it anticipatory. So those examples don't help you at all because none of them contain all the elements of the claim that is accused of being anticipatory. Am I wrong about that? Is that example you're pointing to, doesn't it? My recollection is it includes higher than .15% of your secondary lubricant. Your Honor, we do respectfully disagree, and it's for this reason. This is exactly like the Paracone case. If you go through Columns 2 and 3, 1 through 3, of the 846 patent, what you see is we have a discrete list of particular components, saturated fatty acid amides, such as stearamide, oleamide, and erosamide. So that's the first part, and it's a discrete list. It's not long. It's not thousands of lubricants, as any of us has said, and it's very specific that those are saturated and unsaturated fatty acid amides are lubricants that give good results. The patent also teaches, 846 patent, that you can use one of those alone or both of them, and then it goes on after that and says the lubricating agent, which is one or more, is .1 or .2 or .4. At least .1, at least .2, at least .4, and up to a maximum of 1. Yes, Your Honor. That is the complete sentence. Yes, that's absolutely correct. But again, in identifying the most common points, along with the example 1, that tells one of ordinary skill in the art that here's your laundry list to choose from, you can use one of those, and here's the amount of the lubricant. But let me go back to the other range issue, too, because I think it's important. Am I wrong about the example? Don't all the examples in this disclosure have a secondary lubricant at higher than .15%? The preferred embodiment, you're absolutely correct. That is the preferred embodiment. And so if it were this court's precedent to limit the disclosure to the preferred embodiment, that would then be the result. But that's not this court's precedent. The court is to look at the full extent of an enabling disclosure. And what it says is we have this finite list, saturated fatty acid amide, that can be used in a specific amount. But let me go back to the range issue, as well. If you're going to believe... What if we don't buy the notion that a range isn't a range? Well... Because that's pretty much what you're arguing. Sure. So just very briefly, if you say .1 to .2, you've got to narrow between .1 and .2, you've got some ranges here. And clear value says if you look at if there are enough ranges disclosed in context, you have then anticipated the entire range. But I'll go directly to criticality. You're absolutely correct that there was not evidence presented of criticality from the side of INEOS. Did you argue this? No, Your Honor. Our position was, as below, was the most common amount and that those were points within the range. Wait, wait, wait. That's not quite true. It was discussed below, and they responded by arguing that they'd shown criticality in their opposition to the summary judgment motion. Yes. And what I meant by that comment was that that was something we argued did not apply. Criticality did not apply because we had these points within the range. When they argued that it did apply and that they'd shown criticality. So the issue was joined. Yes. What I was getting at was the point that there was not criticality shown in the way that the court has just now articulated it. Why don't you have a problem under Osram? As Mr. Dutter points out, they argued criticality, they put in evidence that they think shows criticality, and you didn't even respond. Or is that the end of the inquiry on a summary judgment? No, because they did not submit evidence of criticality with respect to the operability of the invention. It wasn't there. But wait, did you argue that at any point in your brief below or to this court? We did argue that criticality had not been shown, but we also argued... And do you have a site you could put me to in a brief? Because all I read your brief was arguing that criticality is irrelevant, but I didn't read it as saying they failed to create a material question of fact about criticality. And that is probably the most fair reading of our arguments below. Our position was that criticality doesn't apply, because we've got these discrete ranges and we've got points within a range. And if you look also at the 846 patent and the 863 patent and look at the examples and the organoelastic properties that they say are there, are disclosed, they both come up with an organoelastic index of the same, of 1.3. So you're correct. Our position has always been that criticality does not apply. But there is evidence just on the face of these patents that it's not there. And again... Who has the burden here? I mean, that seems to me to be a pertinent issue. If they've refined the range that existed in an earlier disclosure, do they have the burden of showing criticality or do you have the burden of showing lack of criticality? Well, they have to come back and then show criticality. That was their burden. Right, but the lower court didn't make any findings with respect to criticality, did it? He did not. What he found, it was, again, that we have, that if you ignore... I mean, the result of this would be to ignore, as you've noted with the word of least and that we have a long sentence, would be to ignore that specification completely and find there's no disclosure at all. And so we can have our 0.1, 0.4, at least 0.2, at least 0.4, and the most common points. And what they're saying is, is I can come in then after that, and even though I've got all of these ranges disclosed, I can then patent something that is 0 to 0.5%. Now, there's another issue here that's important too, which is even if you get rid of the 846 patent, you can also look at Murakami. They made no argument whatsoever with respect to criticality of Murakami. Murakami has nearly the identical range. It goes to 0.5. Did the district court make any findings on Murakami? No, the district court found that he didn't need to because he had found that the 846 patent was dispositive of this issue. But it would simply be improper for there to be this large disclosure of these intermediate ranges, which was not the case in Adafina. It just wasn't there. It was 100 or less, I believe, was the number, or I'm sorry, those were the heating ranges. But there was no disclosure of those points within the range. And again, with the 846, we have it from start to finish, all of these various disclosures. And even if you look at the 863 patent ranges, they're not much different. It's at least 0.5. It doesn't exceed 0.35% by weight. So there we have the same issue, and you have in the 846 of the most common amounts being at least 0.4. Again, that was what made us to believe that criticality was not an issue. And again, the criticality issue, the way that it was couched by INEOS and the way where we did not have the opportunity to respond, was it was criticality in relation to keeping the subsidiary lubricant low. And that was another issue that... Why do you think you didn't have an opportunity to respond? Were you somehow deprived of notice, or... I don't understand. Your Honor, there was very little argument, if at all, on the criticality of the... Did you file a reply to their opposition? Yes, Your Honor. Well, so that was an opportunity, right? What I'm saying is that the issue, the core issue with respect to criticality in the lower court had to do with the criticality of limiting the subsidiary lubricant. That was the primary argument made before the district court. And so if we had thought it was that the core issue had to do with criticality and that that was a real issue, we absolutely would have briefed it. Well, but you had a chance, and you were unnoticed. They submitted two declarations dealing with the secondary lubricant, but flume goes to both. And so you were unnoticed, and they argued this point below. So I don't think I understand your lack of notice point. The lack of notice, Your Honor, is, again, that the focus was on the subsidiary lubricant. And that was the primary focus that was before the court below. I'd like to move to the issue of behenamide, if it's of interest. No, I would really rather you stick with this criticality point. Why, if we don't agree with you on the range argument that you make with regard to the prior art, and if we feel like we have to analyze criticality, that that's the proper legal analysis to employ in this case, why isn't Mr. Dunner correct that he, his client, proffered unrebutted testimony about criticality? And, I mean, you heard me question him about what the criticality went to in terms of dissecting the actual testimony, but is there something to the idea that the criticality and evidence did in fact go to, I'm going to say it wrong, organolithic properties, I don't know how to say that word, organoleptic properties, I had to look it up, but is there some truth to the notion that, look, organoleptic, according to my definition, now granted, I think it may have been wikipedia or dictionary.com and not a very scientific place, but my understanding was it goes to the senses and the organs, including taste, sight, smell, et cetera. So if this patent is directed, if its criticality is to organoleptic properties, and the only ones mentioned are odor and taste, why wouldn't blooming, which goes to the notion of sight, nonetheless be something that at least there's a question of fact maybe about criticality and its relevance to operability when they start talking about blooming? Because, Your Honor, again, so the claim doesn't talk about at all, does not talk about odor or off taste at all. I mean, all we have is one sentence from paragraph 19, or a couple of sentences that talk about limiting it to .5. But again, we have specifically, that's it, and if you look at the face of the patent, the 863 patent, again, the organoleptic properties of limiting it within this respective range are not clear at all from the disclosure. It's just not there. They're not any better than in the 846 patent, if that's the issue. But there's no limitation with respect to... I don't see how that is actually a relevant inquiry in terms of a criticality analysis, because in Osram, for example, the lamp still worked, it just didn't work as well. The claims were to a lamp. It's not like pregnant or not pregnant. I mean, apparently it's like dimmer switch kind of scenario. The lamp didn't work as well, still worked. And that was enough to create a question with regards to criticality. So I don't know, and those were composition claims. Of course, the composition claim didn't discuss the performance of the lamp, the number of watts it had to put out, amount of light measurable, or anything like that. But nonetheless, the court found that the inquiry for criticality was how well did the lamp work? So likewise here, how well does this product work? Well, what are the criteria that you use to measure how well this product worked? The patent says we've formulated something that is directed to reducing friction while simultaneously reducing bad odor and bad taste. So I mean, why aren't those the relevant inquiries? I mean, if his criticality evidence had gone right to the heart of odor and taste, if you exceed 0.5, you got bad taste, secondary lubricant aside. I mean, if that had been... But if there is a new benefit to an old composition, that doesn't render it patentable. I mean, we know that. The inquiry here is, is it new? We have every permutation of this disclosed, every permutation of a range in the 846 patent. If this 846 patent doesn't anticipate a saturated fatty acid amide in these various amounts that are then later were claimed by the FDA. I will stand here as long as you would like. But the problem is you're fighting the Adafina battle right now. The way in which you're characterizing your argument is, gosh darn it, how could Adafina have come out the way it did? That's the argument you're making. I'm stuck living in the universe where it did come out the way it did, whether I like it or not. So let me be clear. There was nothing from Dr. Scott with respect to criticality of the primary lubricant. There was very little discussion of this point at all, quite frankly. What I'm looking at now is something that says if you limit it to 0.5, a couple of sentences from Denise Plume that say this is good for organoleptic properties. It doesn't tell us why with respect to 0.5, that that's important or not. It simply claims the same ranges that are disclosed in the prior patent. That is all it does. No, it doesn't say it's unexpected either. It just says this is what happened. And again, if you look at, if we want to go down this path and look at the organoleptic properties that are disclosed on the face of both patents, it's identical. So there was very little discussion of this criticality issue. It was, again, focused on something else. And if you look at the prior patent, what I'm looking at is that there aren't improved, at least on the face of the patent, organoleptic properties. Okay. Thank you, Ms. Pollack. Okay. Mr. Dyer, you've got two minutes. When Barry's counsel says there's very little discussion about criticality, it was expressly mentioned in the district court's opinion, expressly mentioned, saying that Barry didn't have to provide any evidence of criticality. It was irrelevant. Well, what difference does that make what the district court... If the district court made a mistake, it's summary judgment. We review it de novo anyway, right? He's not making findings of fact. No, but the point is, he made it clear that it was an issue in the case by talking about it in his is just not so. Plenty of attention was played to criticality. Now, I'd like to briefly mention the Murakami issue, which I didn't reach that, and that is the district court did not reach that issue, and we suggest that this court shouldn't reach that issue. There are several problems with Murakami. Murakami has a lower range, which is one-fifth the extent of our lower range, and the requirement of a principal lubricant in Murakami. There are all kinds of reasons why Murakami is a problem, and this court should not reach that unless and until the district court does. Going to the point about... Barry's counsel talked about this is a new benefit for an old composition. It is not an old composition, not only because of the principal lubricant, but because of the subsidiary lubricant. I know there's an issue as to the zero lower limit, but in this case, we have a disclosure in the 846 patent in which the subsidiary lubricant is the preferred lubricant. They say one or more. All the examples are restricted to the subsidiary lubricant, suggesting to one skilled in the art that if you're only going to have one, you're going to have a subsidiary lubricant, and the range is well above the 0.15 critical lubricant, which in fact Scott does talk about, and I agree. He talked about the subsidiary one, but not... Okay. Yeah, you're right. All right, good. So I check that. Okay. I think we're out of time. Okay. Thank you. Thank you. All right, I will report as adjourned until tomorrow morning at 10.